# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| SOUTHWEST OHIO DISTRICT COUNCIL OF CARPENTERS, Individually and On Behalf of All Others Similarly Situated, | ) Case No:_____ <br> ) <br> ) <br> ) CLASS ACTION |
| Plaintiff, | ) <br> ) |
| vs. | ) <br> ) |
| LENDER PROCESSING SERVICES, INC., JEFFREY S. CARBIENER, LEE A. KENNEDY, and FRANCIS K. CHAN, | ) **COMPLAINT FOR VIOLATION OF** <br> ) **THE FEDERAL SECURITIES LAWS** <br> ) <br> ) |
| Defendants. | ) <br> ) JURY TRIAL DEMANDED |

By and through its undersigned counsel, Plaintiff Southwest Ohio District Council of Carpenters ("Plaintiff") alleges the following against Lender Processing Services, Inc. ("LPS" or the "Company") and certain of the Company's executive officers (the "Individual Defendants"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by LPS and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on LPS's website concerning the Company's public statements; and (d) review of other publicly available information concerning LPS and the Individual Defendants.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action against LPS and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased shares of LPS common stock between July 29, 2009 and October 4, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      LPS, together with its subsidiary Docx LLC ("Docx") provide mortgage-processing services, settlement services, mortgage performance analytics, and default solutions. The Company is a provider of integrated technology product solutions to the mortgage lending industry, specializing in national mortgage processing and default management services. Technology solutions include software that automate all areas of loan servicing, as well as streamline and automate business processes overall.  Default management services are used by mortgage lenders, servicers, attorneys, and trustees to reduce expenses resulting from the management of defaulted loans.

3.      Plaintiff alleges that Defendants have fraudulently inflated LPS's stock price by executing numerous false documents, and engaging in improper and deceptive foreclosure-related activities. LPS's business operations are rife with flawed processes and procedures, especially given that lender affidavits are signed by "robo-signers" who repeatedly approve of information in mortgage documents without actually verifying whether the information was accurate.

4.      In addition to permitting fraudulent execution of lender affidavits, LPS also engaged in fee sharing agreements with law firms, and, along with Docx, was a party to arrangements for backdating or altering court documents used in property transactions.    These

2

activities have been made public in connection with a criminal investigation by the Florida Attorney General. Florida Attorney General Bill McCollum recently subpoenaed LPS and Docx, ordering them to hand over all network agreements with law firms having offices in Florida. According to McCollum, LPS had produced "numerous documents in foreclosure cases that appear to be fabricated...." The law firms under investigation were also subpoenaed for their connections to LPS and other mortgage services companies. In addition, the U.S. Attorney's Office in the Middle District of Florida started an investigation into Docx's business processes and LPS in February 2010, focusing on allegations that the Company mortgage ownership documents were forged and illegally executed. This was followed by other investigations by the Justice Department and other states.

5.      On October 4, 2010, the Company issued a press release downplaying the severity of its fraudulent activities by labeling the allegations as a mere "mischaracterization" of the Company's services. Further, LPS insufficiently attempted to address its deceitful affidavit execution procedures, mortgage assignments made by Docx, and the wide disparity among signatures on mortgage assignments due to "robo-signers".

6.      After LPS issued this press release addressing the claims that it was engaging in improper business practices, the price of LPS stock declined 8.6%, or $2.72 per share, and closed at $28.76 per share on October 4, 2010. Further, on October 5, 2010, LPS's stock again fell an additional 5.04%, or $1.45 per share, closing at $27.31 per share.

7.      Specifically, the Company has failed to disclose the following facts to the investing public:

      (a)      that LPS has been repeatedly engaging in improper and deceptive business practices;

3

    (b)    that Docx has been using robo-signers to falsify lender affidavits and other documents;

    (c)    that LPS has engaged in improper fee sharing agreements with law firms or foreclosure attorneys in Florida, including undisclosed contractual arrangements for wrongful fee splitting; and

    (d)    that, as a result of LPS's deceptive and improper business practices, the Company has reported multiple misleading financial results.

8.    As a result of Defendants' wrongful acts, and false and misleading statements and omissions, there has been a precipitous decline in the market value of the Company's securities. Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

9.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    The Court has personal jurisdiction over this action because LPS does business in this District.

12.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains executive offices within this Judicial District, a substantial portion of the Company's business during the Class Period originated within this Judicial District, and Defendants have received

substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

13.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiff

14.     Plaintiff Southwest Ohio District Council of Carpenters, as set forth in the accompanying certification incorporated by reference herein, purchased the publicly traded securities of LPS during the Class Period and has been damaged thereby.

### B.     Defendants

#### i.       The Company

15.     Defendant LPS is a corporation incorporated under the laws of Delaware with headquarters in Jacksonville, Florida.  During the Class Period, LPS maintained executive offices at 601 Riverside Avenue, Jacksonville, Florida, 32204.

#### ii.      The Individual Defendants

16.     Defendant Jeffrey S. Carbiener ("Carbiener") is, and at all relevant times was, the President and Chief Executive Officer of LPS.

17.     Defendant Lee A. Kennedy ("Kennedy") is, and at all relevant times was, Executive Chairman of the Board of Directors of LPS.

18.     Defendant Francis K. Chan ("Chan") was, at all relevant times, Chief Financial Officer of LPS.  Chan stepped down from this position on October 28, 2010.

19.     Defendants Carbiener, Kennedy, and Chan are referred to herein as the "Individual Defendants."

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of LPS, were privy to confidential, proprietary and material adverse non-public information concerning LPS, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of LPS's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to LPS's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of LPS's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of LPS's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Factual background**

25.    LPS is a provider of integrated technology services to the mortgage lending industry. The Company conducts operations through two reporting segments: (i) Technology, Data and Analytics, and (ii) Loan Transaction Services.

26.    Technology product solutions offered by LPS include: (i) a mortgage processing system, (ii) a Desktop system, and (iii) loan transaction services. The mortgage processing

system automates all areas of loan servicing, from loan setup and ongoing processing to customer service, accounting and reporting. The Desktop system is a middleware enterprise workflow management application that is designed to streamline and automate business processes. The loan transaction services offered by LPS include default management services and loan facilitation services.

27.     Before July 2, 2008, the Company was a wholly-owned subsidiary of Fidelity National Information Services, Inc. ("FIS"). However, in October 2007, the board of directors of FIS approved of a restructuring plan, pursuant to which FIS would spin off its lender processing services segment to its shareholders in a tax free distribution. Consequently, on June 16, 2008 FIS contributed to LPS all of its interest in the assets, liabilities, business, and employees related to FIS's lender processing services operations, in exchange for shares of LPS's common stock and $1.585 million aggregate principal amount of the Company's debt obligations. On July 2, 2008, FIS exchanged 100% of LPS's debt obligations for a like amount of FIS's existing Tranche B Term Loans issued under FIS's credit agreement.

28.     LPS offers a suite of technological solutions across the mortgage continuum, such as technology applications, data, analytics, loan facilitation services, and default management services. The Company provides solutions to banks, financial institutions, mortgage lenders, mortgage loan servicers, attorneys, trustees, and real estate professionals.

29.     In 2009, LPS's two largest customers, Wells Fargo Bank N.A. and JPMorgan Chase Bank, N.A. each accounted for more than 10% of the Company's aggregate revenue, and more than 10% of the revenue from each the Technology, Data, and Analytics, an Loan Transaction Services segments.

30.     Sales Personnel at LPS have important contacts at lending institution customers and play an important role in the Company's prospecting for new accounts.  Sales personnel attain customers by targeting direct and/or indirect field sales, as well as through inbound and outbound telemarketing efforts.

31.     The Office of the Enterprise is a segment of the Company comprised of a team of senior managers who lead account management and cross-selling of the full range of LPS's services to existing and potential customers at the top of 50 U.S. lending institutions.  Individuals who work in the Office of the Enterprise spend a significant amount of their time on sales and marketing efforts.

32.     Docx, a subsidiary of LPS, is a technology platform that the Company uses to manage its national network of foreclosures.  Docx is the largest lien release and assignment processing firm in the country, with over 100 employees.  Banks use Docx software to track residential mortgages from time of origination until satisfaction or default.  If the borrower defaults, and the bank forecloses, LPS steps in and aids the bank in any paperwork filed with the court.  On April 12, 2010, LPS closed the offices of Docx located in Alpharetta, Georgia.  These offices had been responsible for over a million mortgage assignments over the course of two years.

**B.      False and Misleading Statements**

33.     The Class Period commences on July 29, 2009.  On that date, the Company issued a press release reporting on earnings for the second quarter of 2009 (the "7/29/09 Press Release").  The 7/29/09 Press Release stated, in relevant part:

**Lender Processing Services, Inc. Reports Record Second Quarter Earnings**

Year-over-year revenues increase 35.3%
Adjusted EPS of 83 cents per diluted share

JACKSONVILLE, Fla. — July 29, 2009 — Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $613.2 million for the second quarter of 2009, an increase of 35.3% compared to the second quarter of 2008, and net earnings of $75.2 million or 78 cents per diluted share.

Pro forma adjusted net earnings for the second quarter of 2009 were $79.8 million, or 83 cents per share, compared to $57.8 million, or 61 cents per share, in the second quarter of 2008. Pro forma adjusted net earnings in the current quarter include $2.6 million in after-tax incremental public company costs incurred as a result of LPS being spun-off on July 2, 2008. Also, these results include an adjustment for purchase amortization of 5 cents per share for the second quarter of 2009 while adjustments for the prior year quarter included pro forma interest expense of 15 cents per share, purchase amortization of 6 cents per share and excluded certain non-recurring charges that accounted for 3 cents per share.

34.     In discussing these results, Defendant Kennedy stated:

LPS had a very strong second quarter despite a challenging macroeconomic environment. LPS, with its comprehensive end-to-end solutions for the mortgage and real estate industries, remains well positioned for an outstanding year in 2009 and to continue to grow profitably in 2010 and beyond.

35.     Also discussing the second quarter 2009 financial results, Defendant Carbiener

stated:

Second quarter earnings were very solid across all our businesses. Our Default Services business continued to deliver strong results while our Loan Facilitation Services benefitted from the improved origination environment. Also, our Mortgage Processing and other technology businesses had an excellent quarter.

*****

Second quarter and first half 2009 results were very solid and while some of our markets and the broader economy in general pose challenges, LPS with its market leading presence is well positioned for a strong second half in 2009 and to continue to grow revenue and earnings in 2010. Building on the strong first half of the year, we expect third quarter adjusted earnings to be in the range of $0.72-$0.78 per diluted share. For full year 2009, we now expect revenues to grow 20%-22% compared to 2008 and adjusted earnings to be in the $2.91-$3.01 per diluted share range.

36.     On July 30, 2009, after the Company's second quarter earnings results were issued, LPS's stock price went up by 11.4%, or $3.47 per share, and closed at a price of $33.81 per share.

37.     On August 14, 2009, the Company issued a Form 10-Q with the SEC for the period ending June 30, 2009, which was signed by Defendant Chan (the "6/30/09 10-Q"). The 6/30/09 10-Q reiterated the financial results that had been disclosed in the 7/29/09 Press Release.

38.     On October 22, 2009, the Company issued a press release announcing financial results for the third quarter of 2009 (the "10/22/09 Press Release"), which stated, in relevant part:

**Lender Processing Services, Inc. Reports Record Third Quarter Earnings**

Year-over-year revenues increase 32.7%

Adjusted EPS of 83 cents per diluted share

PR Newswire

JACKSONVILLE, Fla., Oct. 22

JACKSONVILLE, Fla., Oct. 22 /PRNewswire-FirstCall/ -- Lender Processing Services, Inc. (NYSE: LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $619.4 million for the third quarter of 2009, an increase of 32.7% compared to the third quarter of 2008, and net earnings of $75.5 million or 78 cents per diluted share.

Adjusted net earnings for the third quarter of 2009 were $80.2 million, or 83 cents per diluted share, compared to $57.8 million, or 61 cents per diluted share, in the third quarter of 2008. Adjusted net earnings in the current quarter include an adjustment for purchase amortization of 5 cents per diluted share while the prior year quarter included a similar adjustment of 7 cents per diluted share.

39.     In discussing the results announced in the 10/22/09 Press Release, Defendant Kennedy stated:

LPS delivered strong results in the third quarter despite an ongoing difficult business environment. LPS with its broad-based, technology-driven end-to-end

11

solutions for the mortgage and real estate industries, remains well positioned for the fourth quarter and to continue to grow profitably in the years ahead.

40.     Also discussing the 10/22/09 Press Release and the third quarter of 2009 financial results, Defendant Carbiener stated:

> All our business segments continued to gain market share in the third quarter. Our Mortgage Processing and other technology businesses posted solid earnings while our Default Services business continued to deliver very strong results. Also, our Loan Facilitation business benefited from a stronger year-over-year origination market.
>
> *****
>
> Third quarter and year-to-date 2009 results were very strong and while the broader macro-economic environment and some of our markets continue to present challenges, LPS with its solid market presence remains well positioned for a strong finish in 2009 and to continue to grow revenue and earnings in 2010. Building on the robust year-to-date results, we expect fourth quarter adjusted earnings to be in the range of 77-79 cents per diluted share. For full year 2009, we now expect revenues to grow 26%-28% compared to 2008 and adjusted earnings to be in the $3.07-$3.09 per diluted share range.

41.     On October 23, 2009, the price of LPS stock increased 7.8%, or $3.18 per share, and closed at a price of $43.99 per share.

42.     On November 16, 2009, the Company filed a Form 10-Q with the SEC, for the period ending September 30, 2009, which was signed by Defendant Chan (the "9/30/09 10-Q"). The 9/30/09 10-Q reiterated the financial results that had been discussed in the 10/22/09 Press Release.

43.     On February 8, 2010, the Company issued a press release announcing financial results for the fourth quarter of 2009 and full-year 2009 (the "2/8/10 Press Release"), which stated, in relevant part:

**Lender Processing Services, Inc. Reports Strong Fourth Quarter Earnings**

Year-over-year revenues increase 28.3%

12

Adjusted EPS of 82 cents per diluted share

JACKSONVILLE, Fla., Feb. 8, 2010 /PRNewswire-FirstCall/ -- Lender
Processing Services, Inc. (NYSE: LPS), a leading provider of integrated
technology and services to the mortgage and real estate industries, today reported
consolidated revenues of $608.1 million for the fourth quarter of 2009, an
increase of 28.3% compared to the fourth quarter of 2008, and net earnings of
$74.9 million or 77 cents per diluted share.

Adjusted net earnings for the fourth quarter of 2009 were $79.6 million, or 82
cents per diluted share, compared to $60.9 million, or 64 cents per diluted share in
the fourth quarter of 2008.  Adjusted net earnings in the current quarter include an
adjustment for purchase price amortization of 5 cents per diluted share while the
prior year quarter included a similar adjustment of 7 cents per diluted share.

44.     In discussing the fourth quarter 2009 financial results, Defendant Kennedy stated:

LPS had a strong fourth quarter despite challenging market conditions and a
fragile macro-economic environment.  LPS with its market-leading presence and
its unique technology-driven solutions for the mortgage and real estate industries,
remains well positioned to achieve its growth objectives in 2010 and beyond.

45.     In addition, Defendant Carbiener commented on the fourth quarter 2009 financial

results stated in the 2/8/10 Press Release, stating:

Our Loan Facilitation business posted record growth as it benefitted from a better
year-over-year origination market while our Default Services business continued
to deliver very strong results.  Also, our Mortgage Processing and other
technology businesses had another outstanding quarter.  During 2009, we
continued to strengthen our balance sheet and increase our financial flexibility by
paying down $262 million in debt.

46.     The 2/8/10 Press Release also discussed financial results for full-year 2009:

Full year 2009 revenues of $2.4 billion were a solid 29.0% above 2008 while net
earnings of $275.7 million in 2009 compared to $230.9 million in the prior year.
Adjusted net earnings for full year 2009 of $300.3 million were a record 30.2%
higher than pro forma adjusted net earnings in 2008.

Adjusted free cash flow (net cash provided by operating activities minus certain
non-recurring expenses and additions to property, equipment and computer
software) for full year 2009 of $349.2 million was well above the $276.5 million
for 2008 (which also reflects the impact of pro forma interest expense for the
first six months of 2008) primarily due to strong operating results combined with
greater efficiency in working capital management.

47.     In discussing the full-year 2009 financial results and providing an outlook for

2010, Defendant Carbiener stated:

> We had an exceptional year in 2009 and while the broader economy and the real
> estate market in particular remain challenging, LPS has a strong presence in each
> of its businesses and is well positioned to grow revenue and earnings in 2010.
> Building on the strong 2009 results, we expect first quarter 2010 adjusted
> earnings to be in the range of 78-80 cents per diluted share. For full year 2010, we
> expect revenues to grow 8%-10% compared to 2009 and adjusted earnings to be
> in the $3.49-$3.56 per diluted share range.

48.     On February 23, 2010, the Company filed a Form 10-K with the SEC which was

signed by Defendants Carbiener, Chan, and Kennedy, and also certified by Defendants Carbiener

and Chan (the "2009 Form 10-K").  The 2009 Form 10-K discussed information regarding an

investigation into the Company's business operations and practices, and stated as follows:

> Recently, during an internal review of the business processes used by our
> document solutions subsidiary, we identified a business process *that caused an
> error in the notarization of certain documents*, some of which were used in
> foreclosure proceedings in various jurisdictions around the country. The services
> *performed by this subsidiary* were offered to a limited number of customers, were
> unrelated to our core default management services and were immaterial to our
> financial results. We immediately corrected the business process and began to
> take remedial actions necessary to cure the defect in an effort to minimize the
> impact of the error. *We subsequently received an inquiry relating to this matter
> from the Clerk of Court of Fulton County, Georgia, which is the regulatory
> body responsible for licensing the notaries used by our document solutions
> subsidiary.* In response, we met with the Clerk of Court, along with members of
> her staff, and reported on our identification of the error and the status of the
> corrective actions that were underway. We have since completed our remediation
> efforts with respect to the affected documents. Most recently, we have learned
> that the U.S. Attorney's office for the Middle District of Florida is reviewing the
> business processes of this subsidiary. We have expressed our willingness to fully
> cooperate with the U.S. Attorney. We continue to believe that we have taken
> necessary remedial action with respect to this matter.

(Emphasis added).

49.    On April 3, 2010, the *Wall Street Journal* published an article titled "U.S. Probes Foreclosure-Data Provider".  This article discussed, in detail, an investigation of LPS and Docx commenced by federal prosecutors in the Middle District of Florida, and stated in relevant part:

> A subsidiary of a company that is a top provider of the documentation used by banks in the foreclosure process is under investigation by federal prosecutors.
>
> The prosecutors are "reviewing the business processes" of the subsidiary of Lender Processing Services Inc., based in Jacksonville, Fla., according to the company's annual securities filing released in February. People familiar with the matter say the probe is criminal in nature.
>
> Michelle Kersch, an LPS spokeswoman, said the subsidiary being investigated is Docx LLC. Docx processes and sometimes produces documents needed by banks to prove they own the mortgages. LPS's annual report said that the processes under review have been "terminated," and that the company has expressed its willingness to cooperate. Ms. Kersch declined to comment further on the probe.
>
> *****
>
> LPS has said its software is used by banks to track the majority of U.S. residential mortgages from the time they are originated until the debt is satisfied or a borrower defaults. When a borrower defaults and a bank needs to foreclose, LPS helps process paperwork the bank uses in court.
>
> LPS was recently referenced in a bankruptcy case involving Sylvia Nuer, a Bronx, N.Y., homeowner who had filed for protection from creditors in 2008.
>
> Diana Adams, a U.S. government lawyer who monitors bankruptcy courts, argued in a brief filed earlier this year in the Nuer case that an LPS employee signed a document that wrongly said J.P. Morgan Chase & Co. had owned Ms. Nuer's loan.
>
> Documents related to the loan were "patently false or misleading," according to Ms. Adams's court papers. J.P. Morgan Chase, which has withdrawn its request to foreclose, declined to comment.
>
> *****
>
> Some lawyers representing homeowners have claimed that banks routinely file erroneous paperwork showing they have a right to foreclose when they don't.
>
> Firms that process the paperwork are either "producing so many documents per day that nobody is reviewing anything, even to make sure they have the names

right, or you've got some massive software problem," said O. Max Gardner, a consumer-bankruptcy attorney in Shelby N.C., who has defended clients against foreclosure actions.

The wave of foreclosures and housing crisis appears to have helped LPS. According to the annual securities filing, foreclosure-related revenue was $1.1 billion last year compared with $473 million in 2007.

LPS has acknowledged problems in its paperwork. In its annual securities filing, in which it disclosed the federal probe, the company said it had found "an error" in how Docx handled notarization of some documents. Docx also has processed documents used in courts that incorrectly claimed an entity called "Bogus Assignee" was the owner of the loan, according to documents reviewed by The Wall Street Journal.

Ms. Kersch said the "bogus" phrase was used as a placeholder. "Unfortunately, on a few occasions, the document was inadvertently recorded before the field was updated," she said.

50.    On April 16, 2010, an article was published in the *Dow Jones Daily Bankruptcy Review* titled "DOJ Probing Mortgage Data Processing Firms".   This article discussed a nationwide U.S. Department of Justice probe focused largely on LPS's business practices, and stated in relevant part:

The Department of Justice is conducting a nationwide probe of the company whose automated systems handle half the mortgages in the U.S., looking for evidence Lender Processing Services Inc. (LPS) has "improperly directed" the actions of lawyers in bankruptcy court...

Although the companies say they are providers of electronic information services, the U.S. trustee believes LPS and Fidelity play a "much greater" role in court actions where thousands of homes are at risk of foreclosure, according to Bankruptcy Judge Diane Weiss Sigmund.

***"The thoughtless mechanical employment of computer-driven models and communications to inexpensively traverse the path to foreclosure offends the integrity of our American bankruptcy system,"*** Sigmund wrote in a decision released Wednesday, April 15.

*****

***Fidelity, later LPS, is the electronic powerhouse behind the foreclosures rolling through much of the country***, taking in data and spitting out loan-default notices

16

for 16 of the 20 largest mortgage-loan servicers in the nation. Banks like HSBC and mortgage servicers outsource the handling of their troubled loans to LPS's default management services business.

Business is booming in the loan default unit, LPS's financial reports say, with *revenue up 68.3% for the fourth quarter of 2008*, compared with the same period a year earlier. Consumer advocates have long complained that Fidelity and LPS are much more than electronic data providers. *The companies say which lawyers get the lucrative business of foreclosing on troubled homeowners.* Those who move the fastest are rewarded, said O. Max Gardner III, a consumer bankruptcy attorney. *Those who pause to ask questions or to investigate whether a loan should be foreclosed, don't last as LPS network attorneys*, Gardner said.

"The Fidelity-LPS system represents a complete outsourcing of the foreclosure and bankruptcy process to a thirdparty, Fidelity-LPS, who then manages the entire legal process," Gardner said in an e-mail Thursday, April 16. Sigmund's opinion revealed that the Department of Justice is looking at Fidelity, LPS and the law firm that handles HSBC Mortgage Corp.'s troubled loan business nationwide, Moss Codilis LLP.

(Emphasis added).

51.    On April 17, 2010 LPS issued a press release that purported to offer "clarifications" of the "inaccuracies" found in the *Dow Jones Bankruptcy Review* article. LPS's statements included the following, in relevant part:

LPS is not aware, nor has it been informed, that it is the subject of a formal investigation by the Department of Justice. Certain regional U.S. Trustees Offices, which are statutorily charged with oversight of the bankruptcy process, have inquired about the manner in which LPS's proprietary technology and services are used during bankruptcy and foreclosure proceedings.

52.    On April 22, 2010, the Company issued a press release announcing the Company's financial results for the first quarter of 2010 (the "4/22/2010 Press Release") which stated, in relevant part:

**Lender Processing Services, Inc. Reports Strong First Quarter Earnings**

Year-over-year revenues increase 11.8%
Year-over-year adjusted EPS increases 25.0%

JACKSONVILLE, Fla., April 22 /PRNewswire-FirstCall/ -- Lender Processing Services, Inc. (NYSE: LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $592.4 million for the first quarter of 2010, an increase of 11.8% compared to the first quarter of 2009. Net earnings of $72.5 million or 75 cents per diluted share in the first quarter of 2010 increased from $50.0 million or 53 cents per diluted share in the first quarter of 2009.

Adjusted net earnings for the first quarter of 2010 were $76.7 million, or 80 cents per diluted share, compared to $60.6 million, or 64 cents per diluted share in the first quarter of 2009. Adjusted net earnings in the current quarter include an adjustment for purchase price amortization of 5 cents per diluted share while the prior year quarter excluded an after-tax charge of 6 cents per diluted share primarily related to the retirement of three members of LPS's Board of Directors and included an adjustment for purchase price amortization of 5 cents per diluted share.

53.   In discussing the first quarter 2010 financial results in the 4/22/2010 Press

Release, Defendant Kennedy stated:

LPS is off to a strong start in 2010 despite difficult market conditions and a challenging broader macro-economic environment. LPS, with its strong market presence and its unique portfolio of services, remains well positioned to achieve its growth objectives in 2010 and beyond.

54.   Defendant Carbiener also commented on the financial results for the first quarter

of 2010 in the 4/22/2010 Press Release, and stated:

Our Loan Facilitation business posted record growth in a sluggish year-over-year origination market as we continued to gain market share. Our Default Services business grew year-over-year as well, despite being impacted by broader industry slowdowns. Also, our Mortgage Processing and other Technology businesses delivered another strong quarter.

*****

We are off to a strong start in 2010 and while the broader economy and some of our markets remain challenging, LPS has a market-leading presence in each of its businesses and remains in a good position to grow revenue and earnings in 2010. Building on the first quarter results, we expect second quarter 2010 adjusted earnings to be in the range of 88-90 cents per diluted share. For full year 2010, we continue to expect revenues to grow 8%-10% compared to 2009, driven by the strong momentum in Loan Facilitation Services, key customer wins in our Desktop business, a solid run rate in March in Default Services combined with

continued growth in foreclosure activity through the remainder of the year. Also, we continue to expect adjusted earnings to be in the $3.49-$3.56 per diluted share range.

55.    On May 7, 2010, LPS filed a Form 10-Q with the SEC for the period ending March 31, 2010 (the "3/31/2010 Form 10-Q"), which was signed by Defendant Chan. The 3/31/2010 10-Q reiterated the financial results that were discussed in the 4/22/2010 Press Release.

56.    On July 22, 2010, the Company issued a press release discussing the financial results for the second quarter of 2010 (the "7/22/2010 Press Release") which stated, in relevant part:

**Lender Processing Services, Inc. Reports Strong Second Quarter Earnings**

Year-over-year operating income increases 3.3%
Year-over-year adjusted EPS increases 7.2% to 89 cents per diluted share

JACKSONVILLE, Fla., July 22, 2010 /PRNewswire via COMTEX/ --

Lender Processing Services, Inc. (NYSE: LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $599.1 million for the second quarter of 2010, a decrease of 2.3% compared to the second quarter of 2009; however, net earnings of $80.4 million or 85 cents per diluted share in the second quarter of 2010 increased from $75.2 million or 78 cents per diluted share in the prior year quarter.

Adjusted net earnings for the second quarter of 2010 were $84.0 million, or 89 cents per diluted share, compared to $79.8 million, or 83 cents per diluted share in the second quarter of 2009. Adjusted net earnings in the current quarter include an adjustment for purchase price amortization of 4 cents per diluted share while the prior year quarter included a similar adjustment of 5 cents per diluted share.

57.    In discussing the financial results for the second quarter of 2010, Defendant Kennedy stated:

LPS had a strong quarter despite very difficult conditions in both the origination and default markets and a sustained challenging macro-economic environment. LPS, with its comprehensive end-to-end solutions for the mortgage and real estate

industries, remains well positioned for a solid 2010 and to continue to grow profitably in 2011 and beyond.

58.     Further, Defendant Carbiener also discussed the second quarter 2010 financial results in the 7/22/2010 Press Release:

> Our Mortgage Processing business delivered another strong quarter and while our Loan Facilitation and Default Services businesses were both impacted by sluggish industry trends, we continued to expand market share in both areas.
>
> \*\*\*\*\*
>
> Second quarter and first half 2010 results were solid given the challenges in our specific markets and the broader economic environment. LPS with its market-leading presence remains well positioned to grow revenue and earnings in the second half of 2010 as well as in 2011. Based on trends in the first half of 2010 and the outlook for the remainder of the year for the origination and default markets, we now expect full year 2010 revenues to grow 3%-6% compared to 2009. Also, we continue to expect full year 2010 adjusted earnings to be in the $3.49-$3.56 per diluted share range with third quarter adjusted earnings in the 88-90 cents per diluted share range.

59.     On July 23, 2010, the Company's stock price decreased 6.17%, or $2.30 per share, to close at $31.99 per share.

60.     On August 9, 2010, LPS filed a Form 10-Q for the period ending June 30, 2010, which was signed by Defendant Chan (the "6/30/2010 Form 10-Q"), which reiterated the financial results announced in the 7/22/2010 Press Release.

C.     **The Truth Comes to Light**

61.     On October 4, 2010, amid growing media speculation and suspicion as to the potentially fraudulent nature of LPS's business activities, the Company issued a press release to discuss these issues (the "10/4/10 Press Release"). The 10/4/10 Press Release attempted to minimize claims of fraudulent and deceptive behavior by LPS, by stating that the Company's services had been "mischaracterize[ed]":

**LPS Comments on Recent Mischaracterizations of its Services**

20

JACKSONVILLE, Fla., Oct 04, 2010 /PRNewswire via COMTEX/ --

LPS is issuing this statement in response to recent mischaracterizations in the media regarding the default-related services LPS provides to mortgage lenders/servicers. Specifically, recent concerns have focused on foreclosure issues related to the *execution of affidavits* containing substantive borrower information and the *preparation of assignments of mortgage*.

LPS has not executed affidavits containing substantive borrower information on behalf of its lender/servicer clients since September 2008. When LPS performed this service, affidavits were prepared and provided by the lenders' or servicers' attorneys. These affidavits were then executed by LPS consistent with industry practice, under corporate resolution. LPS had processes in place to ensure the information in the affidavits was validated and that the affidavits were signed properly.

In reference to assignments of mortgage, LPS has made previous statements regarding its document preparation subsidiary, Docx, LLC. This small subsidiary (less than one percent of LPS' revenue) prepared assignments of mortgage for two lenders/servicers between 2008 and 2009. Docx did not prepare or execute affidavits containing substantive borrower information and *no longer provides document preparation services*.

During its operation, when lenders/servicers or their attorneys requested that Docx prepare an assignment of mortgage, the lenders/servicers or their attorneys provided the necessary borrower information, which was downloaded by Docx employees into a pre-approved document template. The document was then printed and either signed by the lender/servicer or Docx, pursuant to corporate resolution. Docx did not determine whether these documents were then used in a court proceeding - those decisions were made solely by the lenders/servicers or their attorneys.

There have also been reports in the media regarding *varying signature styles on assignments of mortgage*. The varying signature styles resulted from a decision made by the manager of Docx to allow an employee to sign an authorized employee's name with his or her express written consent. LPS was unaware of this practice. As previously reported, upon learning of it, LPS immediately took remedial actions to correct all assignments of mortgage signed in this manner and provided these corrected assignments of mortgage to the two lender/servicer clients or their attorneys. LPS continues to believe this will not have a material adverse impact on its business or results of operations.

(Emphasis added).

62.     On October 4, 2010, the same day that LPS issued the 10/4/10 Press Release, and in reaction to the information contained therein, the Company's stock fell 8.6%, or $2.72 per share, and closed at a price of $28.76 per share.  Further, the next day, October 5, 2010, LPS's stock fell again by 5.04%, or $1.45 per share, and closed at a price of $27.31 per share.

63.     On October 8, 2010, an article was published on *DailyFinance.com* which discussed mortgage foreclosure process problems across the nation, as well as LPS's role in these problems.  The article also touched upon LPS's purported illegal fee-sharing arrangements and litigation that developed as a result:

> The mortgage foreclosure and robo-signing mess keeps getting messier. And the giant banks that have been caught up in the crisis have plenty of company, including ***Lender Processing Services and its subsidiary LPS, which plays a huge role in foreclosure process now in high gear across the U.S.*** LPS describes itself as the nation's "number one provider of mortgage processing services, settlement services and default solutions," working with all the top-50 banks in the country.
>
> To provide its "default solutions," LPS maintains a nationwide network of attorneys who do enormous volumes of foreclosure work. The core of the service LPS provides is a software application that enables its attorneys to communicate with LPS and with LPS's financial institution clients. ***Documents are uploaded, and sometimes created, in the system and then distributed for signing, often as it turns out, by robo-signers***. LPS makes money from its default services work primarily via the various fees it charges attorneys it refers cases -- far more so than from the fees it charges its bank/mortgage servicer clients.
>
> Two class actions challenge LPS's get-paid-by-the-lawyers business model. ***That's made investors wary about LPS's stock, which took big tumbles on Oct. 4 and 5, and closed more than 5% lower on Oct. 8 at $26.39.*** To reassure investors, LPS issued an Oct. 4 press release and held an Oct. 6 conference call, a Bloomberg transcript of which I've reviewed. One finding upon reviewing those public statements in the context of court records and other evidence is that ***LPS's claims appear to go pretty far beyond the available record***. Requests to get comment from LPS have not been answered.
>
> Illegal Fee-Sharing?
>
> First a look at the two major class actions, in Mississippi and Kentucky, that have been filed against LPS and local law firms LPS refers business to. While

> LPS had net income of $276 million in 2009, as the website Naked Capitalism
> discusses, the money at stake in the suits is enormous, potentially billions of
> dollars in attorney's fees. The Mississippi class action also targets a similar firm,
> Prommis Solutions, while the Kentucky class action focuses on LPS. The suits
> go to the heart of LPS's and Prommis's business models. ***In addition to the fee
> structure complaint, the respective suits charge LPS and Prommis with the
> unauthorized practice of law***. And despite LPS's bold public statements that the
> suits pose little threat, an attorney who represented the plaintiff in a similar class
> action in 2008 strongly disagrees, disputing the way the company has
> characterized that prior suit.

> ***At issue is the way money flows*** between the law firms and LPS/Prommis.
> Specifically, does the LPS/Prommis business model constitute ***illegal fee-
> sharing and/or kickbacks***? Sharing legal fees with nonlawyers is illegal, and the
> neither LPS nor Prommis are law firms. If plaintiffs win either case, it's hard to
> see how the companies can continue in their present form.

(Emphasis added).

64.     *DailyFinance.com* also published another article on October 13, 2010 titled

"Florida Attorney General Subpoena's Lender Processing Services" which discussed how the

Florida Attorney General's Office had subpoenaed LPS as a part of its investigation into LPS's

business practices:

> ***Florida's attorney general's office has subpoenaed Lender Processing Services
> (LPS), a company deeply mired in the foreclosure mess, as part of its
> investigation into potentially flawed foreclosure paperwork***. The subpoena, dated
> Wednesday, appears to be the first step in a civil -- not criminal -- investigation of
> LPS.

> It's the latest piece of very bad news for LPS, which is currently facing two class-
> actions alleging its business model is illegal. The AG's office is investigating the
> possibility that ***LPS and its DocX subsidiary created "forged, incorrectly and
> illegally executed, false and misleading" documents to accelerate foreclosures.***

> "These documents are used in court cases as 'real' documents of assignment and
> presented to the court as so, when ***it actually appears that they are fabricated in
> order to meet the demands of the institution*** that does not, in fact, have the
> necessary documentation to foreclose according to law," according to the AG's
> website.

> Michelle Kersch, a senior vice president at LPS, confirmed the company received
> the subpoena Wednesday. "As we have said before, LPS has been cooperating

fully with all such inquiries, and of course we look forward to the opportunity to continue to bring greater clarity to our business," she said in an email interview.

Sponsored Links
The Florida AG's office has requested a broad range of LPS documents, including every "network agreement" that LPS has signed with a Florida law firm; all policies and procedures manuals or training materials, including those related to drafting or signing foreclosure and mortgage documents; any price lists LPS gives customers; its financial transactions with title companies, process servers and recording services in connection with foreclosures; and similar documents involving the four foreclosure law firms the Florida AG is currently investigating: The Law Offices of David J. Stern, Florida Default Law Group, Shapiro & Fishman, and the Law Offices of Marshall C. Watson.

The subpoena is signed by the two assistant attorneys general who conducted the deposition of *Tammie Lou Kapusta, a former paralegal at the Law Offices of David J. Stern, who testified that the law firm manufactured documents as needed, backdated documents and signed documents without reading them.*

(Emphasis added).

65.     On December 6, 2010, a story titled "Foreclosure Giant Lender Processing Services Faces Growing Legal Trouble" was published on *Huffingtonpost.com*, and discussed in detail how Defendant Carbiener had misled the investing public as to the condition of legal woes at the Company.  A few excerpts from the lengthy article stated the following:

JACKSONVILLE, Florida (Reuters) - Lender Processing Services is riding the waves of foreclosures sweeping the United States, but in late October its CEO, Jeff Carbiener, found himself needing to reassure investors in the $2.8 billion company.

Although profits were rolling in, *LPS's stock had taken a hit in the wake of revelations that mortgage companies across the country had filed fraudulent documents in foreclosures cases.* Earlier in the year, the company, which handles more than half of the nation's foreclosures, had disclosed that it was under federal criminal investigation and admitted that employees at a small subsidiary had falsely signed foreclosure documents.

Still, *Carbiener told the Wall Street analysts in an October 29 conference call that LPS's legal concerns were overblown*, and the stock has jumped 13 percent since its close the day before the call.

***But a Reuters investigation shows that LPS's legal woes are more serious than he let on. Public records reveal that the company's LPS Default Solutions unit produced documents of dubious authenticity in far larger quantities than it has disclosed, and over a much longer timespan.***

Questionable signing and notarization practices weren't limited to its subsidiary, called DocX, but occurred in at least one of LPS's own offices, mortgage assignments filed in county recorders' offices show. And rather than halt such practices after the federal investigation got underway, ***the company shifted the signing to firms with which it has close business ties***. LPS provided personnel to work in the new signing operations, according to information from an LPS spokeswoman and court records including an October 21 ruling by a judge in Brooklyn, New York. Records in county recorders' offices, and in the judge's opinion, show that "robosigning" and preparation of apparently false documents went on at these sites on a large scale.

\*\*\*\*\*

***LPS-hired notaries who worked there said in interviews that troves of documents were improperly handled.*** They said that about 200 affidavits per day were robosigned during the two months the two notaries remained there.

\*\*\*\*\*

Interviews with key players and court records also show that pending investigations and lawsuits pose a ***bigger threat to the company than Carbiener let on.***

The criminal investigation in Jacksonville by federal prosecutors and the Federal Bureau of Investigation is intensifying. The same goes for a separate inquiry by the Florida attorney general's office. Individuals with direct knowledge of the federal inquiry said that prosecutors have impaneled a grand jury, begun calling witnesses and subpoenaed records from LPS.

The company confirmed to Reuters that it has hired Paul McNulty, former deputy U.S. attorney general in the George W. Bush administration, to represent it in the investigation. A spokeswoman for the U.S. Attorney's office declined to comment on the probe.

The U.S. Comptroller of the Currency's office, which is responsible for supervising national banks, also announced in November that it had teamed up with the Federal Reserve to conduct an on-site examination of LPS.

***Meanwhile, the threats from four class action lawsuits filed in federal courts appear to be greater than the company has indicated,*** especially one filed in Mississippi. In a highly unusual move, a unit of the U.S. Justice Department has

joined that suit as a plaintiff. The lawsuit alleges that LPS extracted many millions of dollars in kickbacks from law firms through an illegal fee-sharing arrangement, in exchange for doling out lucrative foreclosure work to them.

*****

Copies of LPS internal documents obtained by Reuters and testimony in lawsuits shed new light on the company's unusual dealings with its vast network of law firms. LPS relentlessly pressed them for speed. The result was almost instant filing of foreclosure documents, mostly prepared by clerical workers, not lawyers, according to court records, including deposition testimony by LPS officials. Several judicial opinions from around the country and evidence from investigations in Florida show that these documents often were riddled with inaccurate information about the amount homeowners owed, and were signed and notarized en masse without anyone at the firms checking the information in them.

Under LPS's system, law firms that were slower, often because their lawyers carefully prepared and reviewed court documents before filing them, were effectively punished, according to deposition testimony and other sources. The computer automatically assigned bad ratings to these firms, and the flow of work assignments to them dried up.

*****

DUBIOUS DOCUMENTS

*Hundreds of public records examined by Reuters show that production of suspect mortgage assignments was not limited to DocX.*

The records indicate that employees in one of LPS's own offices, in Mendota Heights, Minnesota, signed and notarized large numbers of documents which for multiple reasons appear invalid. Records filed with county recorders' offices show that the Minnesota office continued to turn out these documents at least through the end of January 2010.

Dozens of assignments were signed by LPS Minnesota office employees who listed themselves as corporate officers of banks and other loan servicers, a sampling of public records from counties in five states shows. As at DocX, the assignments were signed years after the mortgages should have been transferred to the investment trusts.

The signature of one of these LPS employees, Liquenda Allotey, appears on thousands of mortgage assignments. Homeowners' lawyers and at least one judge -- federal bankruptcy judge Joel B. Rosenthal in Massachusetts -- have noted that Allotey's signature is a simple zigzag line, raising questions about whether other individuals may have signed his name. Titles listed below the signature identify

him variously as "vice president" or "attorney in fact" for at least 13 banks and mortgage companies.

LPS spokeswoman Kersch said Allotey signed all of the documents himself, and said all mortgage assignments prepared in the Minnesota office "were executed under a lawful grant of authority." She didn't spell out, however, how such authority was given.

In any event, two other aspects of many mortgage assignments signed by Minnesota employees raise strong doubts about the documents' legitimacy.

*****

Equally difficult to explain are mortgage assignments signed by LPS Minnesota employees purporting to be officers of lenders that no longer existed. For example, in January 2010, two Minnesota employees jointly signed one as officers of Encore Credit Corp., defunct since 2008.

On other occasions, LPS employees signed as authorized officers of American Brokers Conduit, well after the subprime lender had been liquidated in bankruptcy. And in many instances they signed as officers of Sand Canyon Corp. In a March 18, 2009 affidavit, Sand Canyon's president, Dale M. Sugimoto, said the company had completely exited the mortgage business in 2008 and had no mortgages to assign.

## V.    THE INDIVIDUAL DEFENDANTS' LIES AND OMISSIONS

66.    LPS's statements and filings during the Class Period were materially false and misleading because they failed to disclose and misrepresented: (1) that LPS has been repeatedly engaging in improper and deceptive business practices; (2) that Docx has been using robo-signers to falsify lender affidavits and other documents; (3) that LPS has been engaging in improper fee sharing agreements with law firms or foreclosure attorneys in Florida, including undisclosed contractual arrangements for wrongful fee splitting; and, (4) that as a result of LPS's deceptive and improper business practices, the Company has been reporting multiple misleading financial results.

67.    In addition to the false and misleading statements described in detail herein, Defendants also failed to disclose the truth regarding LPS's financial condition. Specifically,

27

and in addition to the other omissions described herein, Defendants failed to tell the public the true risks the Company faced with regard to its business operations, and failed to disclose that the Company was engaged in fraudulent and deceptive business practices. As a result, LPS's reported financial results were materially false and misleading.

## VI.  UNDISCLOSED ADVERSE INFORMATION

68.     The market for LPS's securities was an open, well-developed and efficient market at all relevant times. As a result of the materially false and misleading statements and failures to disclose described herein, LPS's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired LPS's securities relying upon the integrity of the market price of LPS's securities and market information related to LPS, and have been damaged thereby.

69.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LPS's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

70.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about LPS's business, prospects and operations.

71.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of LPS and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.   SCIENTER ALLEGATIONS

72.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

73.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding LPS, their control over, receipt and/or modification of LPS's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning LPS, participated in the fraudulent scheme alleged herein.

74.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## VIII.   STATUTORY SAFE HARBOR

75.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected." Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

76.     Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of LPS who knew that such statement was false when made.

## IX.   LOSS CAUSATION

77.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of LPS's securities and operated as a fraud or deceit on Class Period purchasers of LPS's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of LPS's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of LPS's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

78.     By failing to disclose the true state of the Company's business operations, investors were not aware of the true state of the Company's financial status. Therefore,

Defendants presented a misleading picture of LPS's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused LPS to conceal the truth.

79.     Defendants' false and misleading statements had the intended effect and caused LPS's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light on October 4, 2010, LPS's common stock price fell approximately 8.6% percent, and then fell an additional 5.04% the following day.   These drops caused real economic loss to investors who purchased the Company's securities during the Class Period.

80.     The decline in the price of LPS's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.   The timing and magnitude of LPS's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.   The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of LPS's securities and the subsequent decline in the value of LPS's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

81.     At all relevant times, the market for LPS stock was an efficient market for the following reasons, among others:

a.     LPS   securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

        b.     As a regulated issuer, LPS filed periodic public reports with the SEC and the NYSE;

        c.     LPS securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

        d.     LPS regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

82.    As a result, the market for LPS securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in LPS's stock price. Under these circumstances, all purchasers of LPS securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XI.   CLASS ACTION ALLEGATIONS

83.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired LPS securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of LPS and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

84.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, LPS securities were actively traded on the NYSE (an open and efficient market) under the symbol "LPS".  As of October 31, 2010, the Company had approximately 91.32 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by LPS and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

85.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

86.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

        b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

33

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of LPS;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of LPS;

e.      whether the market price of LPS common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XII.   COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants**

89.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants.

90.     During the Class Period, LPS and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of LPS common stock; and (iii) cause Plaintiff and other members of the Class to purchase LPS stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

91.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LPS securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of LPS, as alleged herein.

92.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and

35

performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

93. LPS and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of LPS as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of LPS's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LPS and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of LPS's securities during the Class Period.

94. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and

were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

95.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LPS's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LPS securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of LPS shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the

Class Period, Plaintiff and the other members of the Class acquired LPS securities during the Class Period at artificially inflated high prices and were damaged thereby.

97.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of LPS, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired LPS securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

98.    By virtue of the foregoing, LPS and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

100.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

101.    The Individual Defendants were and acted as controlling persons of LPS within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.    As set forth above, LPS and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

XIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

    c)        Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

    d)        Awarding such other relief as this Court deems appropriate.

## XIV.   <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  January 10, 2011               By: _____

                                     Joseph E. White III (28076)
                                     Maya Saxena (23479)
                                     Christopher S. Jones (25523)
                                     Lester R. Hooker (32242)
                                     2424 N. Federal Highway, Suite 257
                                     Boca Raton, FL 33431
                                     Tel: 561 394-3399
                                     Fax: 561 394-3082

                                     ***Attorneys for Plaintiff***

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Herb Adams, on behalf of the Southwest Ohio District Council of Carpenters ("Carpenters" or "Fund"), certify that:

1. I am authorized by the Board of Trustees of the Fund to initiate litigation on the Fund's behalf and to execute this Certification.

2. I have reviewed a complaint and I authorize Saxena White P.A. to act on the Fund's behalf in this matter in applying for Lead Plaintiff or Class Representative status and for all other purposes in connection with this litigation.

3. The Fund did not acquire the security that is the subject of this action at the direction of counsel, or in order to participate in this private action, or any other litigation under the federal securities laws.

4. The Fund is willing to serve as a Lead Plaintiff or Class Representative, either individually or as part of a group. The Fund understands that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

5. The Fund not will accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. The Fund understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by the Fund's decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all the transactions in the securities of Lender Processing Services, Inc. in the class period:

### SEE ATTACHED SCHEDULE A

8. During the three years prior to the date of this Certification, the Fund has not sought or served as a representative party for a class in an action filed under the Private Securities Litigation Reform Act.

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this 16th day of December, 2010.

Herb Adams, Trustee

SCHEDULE A TO CERTIFICATION OF SOUTHWEST OHIO DISTRICT COUNCIL OF CARPENTERS
Lender Processing Services, Inc.

**PURCHASES**

| Date | # of Shares | Price/Share |
|------|-------------|-------------|
| 1/21/10 | 10,000 | $42.89 |
| 2/4/10 | 2,500 | $39.78 |
| 4/8/10 | 2,000 | $36.90 |

**SALES**

| Date | # of Shares | Price/Share |
|------|-------------|-------------|
| 2/16/10 | 500 | $38.05 |
| 3/26/10 | 500 | $38.42 |
| 4/26/10 | 700 | $38.90 |
| 5/27/10 | 500 | $34.00 |
| 9/21/10 | 70 | $33.56 |